Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

```
TEXAS PRIDE TRAILERS, INC.     )
                               )
VS.                            ) C.A. No. 4:16-cv-00473
                               )
TEXAS MADE TRAILERS, LLC,      )
DEVIN DEWAYNE DAVIS AND        )
DEREK DAVIS                    )
```

ORAL DEPOSITION OF DEVIN DAVIS

August 16th, 2016

ORAL DEPOSITION of DEVIN DAVIS, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 16th day of August, 2016, from 2:12 p.m. to 4:00 p.m. before BRENDA A. FOSTER, CSR in and for the State of Texas, reported by machine shorthand, at the law offices of Cantrell, Ray & Barcus, LLP, 1024 10th Street, Huntsville, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

DEFENDANT'S EXHIBIT K

Devin Davis
Texas Pride Trailers, Inc. v. Texas Made Trailers, LLC, Devin Dewayne Davis and Derek Davis

Page 2

```
 1   APPEARANCES
 2     For the Plaintiff:
 3       MR. W. JOHN GADD
         ATTORNEY AT LAW
 4       2727 ULMERTON ROAD
         SUITE 250
 5       CLEARWATER, FL  33762
         wjg@mazgadd.com
 6       (727) 524-6300
 7
       MS. LISA R. WILCOX
 8     FBN: 697291
       721 FIRST AVE. N
 9     ST. PETERSBURG, FLORIDA  33701
       lisa@wilcoxlawpa.com
10
11     For the Defendants:
12       MR. SETH A. NICHAMOFF
         NICHAMOFF LAW, PC
13       2444 TIMES BLVD., STE. 270
         HOUSTON, TEXAS 77005
14       (713) 503-6706
         (713) 360-7497 fax
15       seth@nichamofflaw.com
16
17
     Also Present:
18     Frank Robinson
19
20            *-*-*-*-*
21
22
23
24
25
```

Page 3

```
 1             I N D E X
 2                              Page
     DEVIN DAVIS
 3     Examination
 4       By Mr. Gadd. . . . . . . . . . . . . . . . 4
         By Mr. Nichamoff. . . . . . . . . . . . .57
 5       By Mr. Gadd. . . . . . . . . . . . . . . .62
 6     Signature . . . . . . . . . . . . . . . . . . 69
       Reporter's Certificate  . . . . . . . . . . . 70
 7
              EXHIBITS
 8   NO.        DESCRIPTION               PAGE
 9   Exhibit 1   Dealer Brochure-Rough Draft    60
     Exhibit 2   Trademark Application       21
10   Exhibit 3   Answers to Complaint        44
     Exhibit 4     Web site comment          58
11   Exhibit 5    Lisa Wilcox correspondence  63
12
             *-*-*-*-*
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              DEVIN DAVIS,
 2   having been first duly sworn, testified as follows:
 3              EXAMINATION
 4   QUESTIONS BY MR. GADD:
 5       Q.  Well, I guess we sort of met informally.  I'm
 6   John Gadd.  I represent Jim Bray and Texas Pride
 7   Trailers.  This is Lisa Wilcox, and I assume you to be
 8   Devin Davis?
 9       A.  Yes.
10       Q.  Now, what we sent to your attorney is a
11   notice for what we call a Rule 30(b) witness, and that
12   means in laymen's terms, the witness who is in a
13   position to speak on behalf of the company.  And so I
14   gather that's you for today, at least in some respects?
15       A.  Yes.
16           MR. NICHAMOFF:  So with respects, you
17   know, I'll make my formal designation pursuant to the
18   rules.  Mr. Davis is here to testify as to all aspects
19   of the business and the claims and counterclaims, save
20   and except for the registration of the trademark, which
21   was handled by Mr. Frank Robinson.
22           MR. GADD:  And that's you, correct?
23           MR. ROBINSON:  Yes.
24       Q.  (By Mr. Gadd)  All right.  Have you taken a
25   deposition before?
```

Page 5

```
 1       A.  No.
 2       Q.  Have you given deposition testimony?
 3       A.  No.
 4       Q.  Never.  Sort of much the same process you saw
 5   your attorney do here with Mr. Bray; I've got a series
 6   of questions I'm going to ask you.  If you don't
 7   understand something, please let me know, and I'll try
 8   to clarify it for you.
 9           How long have you worked in the trailer
10   industry?
11       A.  16 years.
12       Q.  Did you begin working in the trailer industry
13   with Jim Bray?
14       A.  Yes.
15       Q.  Did you work for any other dealers or
16   manufacturers?
17       A.  Yes.
18       Q.  Can you tell me who those are?
19       A.  Loudo, Loudo Enterprises.
20       Q.  No kidding?
21       A.  Uh-huh.
22       Q.  How long did you work with Loudo?
23       A.  Two years.
24       Q.  What years would that have been?
25       A.  '05, '06.
```

Page 6

1  Q. Small world in the trailer industry, huh.
2  Can you tell me what educational background you have?
3  A. A G.E.D.
4  Q. What year did you get that?
5  A. 2008.
6  Q. Do you hold any sort of professional license?
7  A. No, sir.
8  Q. Now, you've heard some discussion today about
9  a manufacturer's license and a dealer's license with
10 respect to a sale of trailers. Do you hold either one
11 of those?
12 A. Not personally.
13 Q. Is there someone that does hold such a
14 license for your business?
15 A. Our partnership.
16 Q. And what year was that obtained?
17 A. 2015.
18 Q. What year did you begin Texas Made Trailers?
19    MR. NICHAMOFF: If I may, if he can
20 differentiate and tell you which licenses the Texas
21 Made Trailers, LLC has.
22    MR. GADD: Sure.
23 A. The WMI; it's a world manufacturers
24 identifier.
25 Q. (By Mr. Gadd) Whose name is that in?

Page 7

1  A. It's in -- is it personal? I believe. I
2  can't recall if it's under my name or if it's just
3  listed as Texas Made Trailers to be honest.
4  Q. Who filed the application?
5  A. Frank.
6  Q. What is WMI?
7  A. It's a world manufacturers identifier. It
8  gives you the first few digits of your VIN number.
9  From there, everything else correlates with the model
10 of the trailer.
11 Q. And what about retail license for selling
12 trailers?
13 A. No, sir.
14 Q. You don't have one of those?
15 A. No, sir.
16 Q. Do you know if you need one or not?
17 A. I don't.
18 Q. Does the business have one?
19 A. No, sir.
20 Q. Do you plan on seeking one, or is it just
21 your position that you don't need one?
22 A. Huh-uh.
23 Q. That was a "no"?
24 A. No.
25 Q. You ever been arrested?

Page 8

1  A. Yes.
2  Q. Can you tell me what years and how many
3  times?
4  A. 2003, battery; 2004, battery; 2008, DUI;
5  2015, DUI.
6  Q. Other than the DUI's, were any of those, did
7  they ultimately lead to a felony conviction?
8  A. Yes.
9  Q. How many felonies are we talking about?
10 A. One.
11 Q. You ever had any convictions for any what we
12 call crimes of dishonesty, bad checks, for example,
13 thefts, things of that nature?
14 A. No, sir.
15 Q. How did your employment come to an end with
16 Loudo?
17 A. Firing, terminated.
18 Q. What position did you hold with Loudo
19 Trailers?
20 A. Sales manager.
21 Q. Is that how you met Jim?
22 A. No. I met Jim before. I worked with Jim
23 before Loudo.
24 Q. I think Jim said that he met you when you
25 were 16 years old?

Page 9

1  A. Uh-huh.
2  Q. What was the first thing he had you doing
3  workwise?
4  A. Running a forklift, stacking trailers and
5  doing repairs.
6  Q. And you said you also worked as a sales
7  manager?
8  A. Uh-huh.
9  Q. What other jobs do you recall having done
10 when you worked with Jim?
11 A. Oh, I've done wiring. I've done paint,
12 stacks, repairs, design, selling, a little bit of it
13 all.
14 Q. Are these all things you learned to do with
15 Jim's shop, or did you learn these skills somewhere
16 else?
17 A. No, all while working in the industry.
18 Q. But you hadn't worked in the industry prior
19 to the age of 16, right?
20 A. No.
21 Q. What I was hoping to sort out is what did you
22 learn working with Jim, and what did you learn working
23 with Lou, for example?
24 A. Jim more so along the lines of just learning
25 the overall construction of the trailers. Loudo was

Page 10

1   more on the sales end, you know.
2       Q.  But by virtue of your work with Jim, you
3   learned how these things get put together, how they're
4   supposed to be made and so forth?
5       A.  Uh-huh.
6       Q.  Have you ever taken any trade school classes?
7       A.  No.
8       Q.  So how long has Texas Made been in business?
9       A.  January 5th of 2015.
10      Q.  So what happened on January 5th, 2015?
11      A.  We just started building trailers.
12      Q.  Your doors were open for business?
13      A.  Yes, sir.
14      Q.  Did you actually have retail products for
15  sale on that date?
16      A.  Yes.
17          MR. NICHAMOFF: Objection, form.
18      A.  Not retail.  Sorry about that.
19      Q.  (By Mr. Gadd)  Wholesale?
20      A.  Wholesale.
21      Q.  So when did you actually begin making
22  trailers?  I mean, if we have January 5th, 2015, as the
23  date you were open for business --
24      A.  Correct.
25      Q.  -- I guess you had to have some kind of an

Page 11

1   inventory or supply?
2       A.  Just a few days over that weekend.  I guess
3   it would have been around the 2nd, 3rd or 4th, just
4   made a few of them.
5       Q.  How long does it take you to make these
6   trailers?
7       A.  A few hours --
8       Q.  And I understand there's --
9       A.  Depending on the model, a few hours to a day.
10      Q.  So who owns Texas Made Trailers?
11      A.  It's a partnership.
12      Q.  Between who?
13      A.  Myself, Frank Robinson, Alan Carpentier,
14  George Russell, Judy -- what's her last name?
15          MR. NICHAMOFF: The ownership is outside
16  the designation.  He may not know all their names.
17          THE WITNESS: Right.
18      Q.  (By Mr. Gadd)  Do you have a corporate
19  structure?  In other words, can you tell me sort of who
20  does what?  I mean, I imagine that you could have some
21  partners that are basically silent maybe or just
22  investors and then you may have more operational
23  partners.  So can you tell me how the partnership
24  works?
25      A.  I'm on day-to-day operations as far as

Page 12

1   production, and then I've got just advisors as far as
2   the business end.
3       Q.  And Frank Robinson would be an advisor?
4       A.  I would say.
5       Q.  How many people do you actively employ at
6   your place of business?
7       A.  30 to 35.
8       Q.  Were any of those -- have any of the
9   employees that you have employed since you opened your
10  doors, have any of them previously worked for Jim Bray?
11      A.  Yes.
12      Q.  Can you tell me who?
13      A.  Jeremiah Watkins.
14      Q.  What does he do for you now?
15      A.  He's an outside kind of Q.C. guy.
16      Q.  As in quality control?
17      A.  That's right.
18      Q.  And he previously worked for Jim?
19      A.  Yes.
20      Q.  Okay, who else?
21      A.  A gentleman by the name of Alfonso Corona.
22      Q.  Can you help me with the spelling of that
23  last name?
24      A.  It's like the beer.
25      Q.  Corona, okay, I don't know anything about it.

Page 13

1   What does he do for you?
2       A.  A fabricator.
3       Q.  And he also worked for Jim?
4       A.  Uh-huh.
5       Q.  Okay.  Are there others?
6       A.  That are currently employed, correct?
7       Q.  Well, I guess what I'd like to do, if I said
8   currently, that may have been a bad way to phrase on my
9   part.  I'd like to get a list of any employees who you
10  have employed during your time in business that were
11  previously employed by Jim.
12      A.  Brian McDonald.
13      Q.  What does he do?
14      A.  Fabricator.
15      Q.  That gives us three so far.  Are there more?
16      A.  Ryan Williams, wire tech.
17      Q.  And that's the guy that actually installed
18  the lights in the trailers and so forth?
19      A.  Uh-huh.
20      Q.  Are there others?
21      A.  Ronald Gilbert, a painter.  That's all I can
22  really come up with right now.  Derek -- oh, no, he
23  don't work there.
24      Q.  Have these fellows all been with you since
25  you opened in 2015?

Page 14

1  A. No, sir.
2  Q. That was a "no"?
3  A. Right, no.
4  Q. How long has Alfonso been with you?
5  A. 10 months.
6  Q. What about Brian?
7  A. Two, three months.
8  Q. Ryan Williams was the next guy that I had.
9  How long has he been with you?
10 A. He was there at the beginning.
11 Q. And what about Ronald Gilbert, the painter?
12 A. 13 to 14 months.
13 Q. Now, had you worked with each of these guys
14 when you were working at Texas Pride?
15 A. No.
16 Q. You didn't know any of these guys during the
17 time that you worked at Texas Pride?
18 A. I have no direct contact at all.
19 Q. How did they come to work for you?
20 A. Heard of the place.
21 Q. Is it your testimony that they contacted you
22 for a job and that you did not reach out to them first?
23 A. A lot of them.
24 Q. Which ones did you reach out to?
25 A. To be honest with you, a lot of them, you

Page 15

1  know, there was such a big gap in between being
2  employed there and me starting this that damn near
3  every guy had heard about this going on before I really
4  had the contact with them.
5  Q. Were there any that you contacted before they
6  contacted you?
7  A. I really wouldn't say so.
8  Q. Do you have a Facebook page?
9  A. Yes.
10 Q. And is it under your name, Devin Davis?
11 A. Yes.
12 Q. Any middle initials being used?
13 A. No.
14 Q. Were you friends with any of these people on
15 Facebook, Alfonso, Brian, Ryan, Ronald?
16 A. I don't believe so. If any, maybe Jeremiah.
17 Q. Well, I guess what I'm curious about is if
18 you had this gap between the time that you left Jim and
19 the time you started your own enterprise, how is it
20 these guys hear about you enough to where they know
21 where to reach you and actually ask for a job?
22 A. I still had my little brother working up
23 there, so I would have to imagine that at some point
24 something was mentioned around there. It was a pretty
25 popular topic at the time.

Page 16

1  Q. Your little brother, he works with you now?
2  A. No.
3  Q. Did he ever?
4  A. No, not for Texas Made.
5  Q. So what's the hiring process like with Texas
6  Made?
7  A. Fill out an application; and as we come in
8  need for a certain position, just comb through the
9  applications and try them out.
10 Q. And who makes the determination with respect
11 to hiring and firing?
12 A. I do for the most part.
13 Q. So you would have been responsible for hiring
14 Alfonso Corona?
15 A. Yes.
16 Q. And Brian McDonald?
17 A. Yeap.
18 Q. Ryan Williams?
19 A. Yes.
20 Q. Ronald Gilbert?
21 A. Yeah.
22 Q. Do you maintain employment personnel files on
23 each of these individuals?
24 A. Yes.
25 Q. And in a general sense, what would those

Page 17

1  documents contain for your employees?
2  A. Social Security cards, driver's license,
3  address, phone numbers, any tax form for employees.
4  Q. The application for employment?
5  A. On some of them I would imagine, uh-huh.
6  Q. Those would be documents that you would
7  retain in the normal course of your business?
8  A. I do not. We have a bookkeeper who takes
9  care of it.
10 Q. And what is her name?
11 A. Tina.
12 Q. Do you know where these documents are kept?
13 A. No, sir.
14 Q. Tina have an office on-site?
15 A. Uh-huh.
16 Q. Filing cabinets?
17 A. Uh-huh.
18 Q. Would you believe that these records would be
19 contained physically within the four corners of her
20 office in a filing cabinet somewhere?
21 A. Yeah, I would have to assume so.
22 Q. Do you maintain computer files on the people
23 as well, employees?
24 A. Yes.
25 Q. Do you have a Web site?

Page 18

1  A. Yes.
2  Q. What's the domain name?
3  A. Texasmadetrailers.com.
4  Q. When did the Web site start?
5  A. 180 days into it, six months after we opened.
6  Q. So it would be within six months after
7  sometime in January of 2015?
8  A. Six months after we opened.
9  Q. And I had that date as January 5th?
10 A. Maybe somewhere around July, June or July.
11 Q. Maybe I wrote that down wrong.
12 A. We opened the doors January.
13 Q. But your Web site would have come up six
14 months later?
15 A. Right.
16 Q. Who designed the Web site for you?
17 A. Ryan Mayo.
18 Q. Now, is he an independent contractor, or is
19 this a third-party vendor that you hired?
20 A. Just a third-party vendor that I hired.
21 Q. Mayo?
22 A. Uh-huh.
23 Q. Do you have his contact information?
24 A. Not on me. We can supply it.
25 Q. Does he live in Madisonville, or does he live

Page 19

1  in Huntsville or somewhere in between?
2  A. No, I believe Conroe.
3  Q. Conroe?
4  A. I believe so.
5  Q. Where is that in relationship to
6  Madisonville?
7  A. An hour south.
8  Q. How did you meet him?
9  A. Through a mutual friend.
10 Q. I mean, does he go by any kind of a trade
11 name, or does he have a business name that he uses, or
12 is he just a guy who does Web sites on the side?
13 A. He just does it on the side. I would have to
14 find out if he's got a name or not.
15 Q. What trademarks do you believe that Texas
16 Made has a lawful right to use?
17 A. Their name.
18 Q. Anything else?
19 A. No.
20     MR. NICHAMOFF: Objection to the
21 question. It calls for a legal conclusion.
22 Q. (By Mr. Gadd) What is prestigetexas.com?
23 A. It's a Prestige, Prestige Contractors
24 Supply's Web site.
25 Q. So what would your e-mail address be for

Page 20

1  Texas Made Trailers?
2  A. Devin@texasmadetrailers.com.
3  Q. Do you have any prestigetexas.com address?
4  A. No.
5  Q. Are you familiar with
6  frank@prestigetexas.com?
7  A. Yes.
8  Q. Who would that be?
9  A. Frank Robinson's.
10 Q. I would like to show you what I'm going to
11 have marked as No. 2. Have you seen this document
12 before, sir?
13 A. Yes.
14 Q. Have you read it before?
15 A. Yes.
16 Q. You're familiar with it?
17 A. Uh-huh.
18 Q. What do you understand that document to be?
19 A. Our trademark documents.
20     MR. NICHAMOFF: If I may, I earlier
21 stated that Mr. Robinson was the one who would be the
22 most knowledgeable. You can certainly ask the
23 questions, but he's not going to be the most
24 knowledgeable.
25     MR. GADD: Fair enough.

Page 21

1  Q. (By Mr. Gadd) I just wondered if you had read
2  the bottom of that page where it says disclaimer.
3  A. Uh-huh.
4  Q. Do you know what that says?
5  A. Yeah.
6  Q. What does it say?
7  A. Must disclaim the name of Texas Made
8  Trailers, unregistrable.
9  Q. Do you still believe you have a valid right
10 to use "Texas Made"?
11     MR. NICHAMOFF: Objection; calls for a
12 legal conclusion, and also this list isn't the topic
13 the witness is designated to testify concerning.
14 A. For Texas Made Trailers, yes.
15 Q. (By Mr. Gadd) Let me show you what I had
16 previously marked as Plaintiff's Exhibit No. 1. I
17 didn't show you. That was actually part of Jim's
18 exhibit; but, nonetheless, do you recognize that photo?
19 A. Yes.
20 Q. Do you recognize the document itself?
21 A. Yes.
22 Q. How would you describe what that document is?
23 A. Preliminary rough draft of a dealer brochure.
24 Q. And was that rough draft circulated between
25 the dealers?

Page 22

1  A. Shouldn't have been.
2  Q. Do you know for a fact whether it was or
3  whether it was not?
4  A. I know there's one dealer that had not.
5  Q. Who would that be?
6  A. Jerry Arthur, Montgomery Truck Sales.
7  Q. And who circulated this to him?
8  A. Again, this was a rough draft he asked me to
9  leave there.
10  Q. And you did so?
11  A. Uh-huh.
12  Q. That picture, you heard Mr. Bray testify, is
13  a trailer that belongs to him or was manufactured by
14  him in his yard. Is that something you dispute?
15  A. No.
16  Q. So you admit that you have a picture of Jim
17  Bray's trailer in an advertising related document that
18  you provided to a dealer?
19       MR. NICHAMOFF: Objection; compound
20  question.
21  Q. (By Mr. Gadd) Is that correct?
22       MR. NICHAMOFF: And misleading.
23  A. Yes.
24  Q. (By Mr. Gadd) What publications do you
25  advertise in? When I say you, I'm referring, of

Page 23

1  course, to Texas Made.
2  A. None.
3  Q. How do you sell your product?
4  A. Through a network of dealers.
5  Q. You don't advertise, for example, Craigslist
6  eBay, Auto Trader, the rest of these publications that
7  are so popular in the industry?
8  A. Our dealers handle all the Craigslist ads.
9  Q. So you don't personally --
10  A. No.
11  Q. On behalf of your company, you do not
12  actually initiate any advertisements?
13  A. No. We don't currently have any
14  advertisements running.
15  Q. Then how do you establish your dealer
16  network?
17  A. Through calls, follow-ups, we mail out
18  brochures.
19  Q. How many dealers are in your network?
20  A. Close to 15 maybe.
21  Q. How many of them can you identify?
22  A. Quite a few.
23  Q. Let me ask you to please do so.
24       MR. NICHAMOFF: I'm going to object to
25  this as being confidential information, subject to a

Page 24

1  confidentiality agreement. If you wanted to declare
2  this portion of the deposition "attorneys' eyes only,
3  not to be shared with clients as part of the
4  confidentiality agreement, order that's been proposed
5  to the Court, the witness can answer subject to that.
6       MR. NICHAMOFF: We'll mark this section
7  confidential, attorneys' eyes only.
8  (The designated confidential attorneys eyes only
9  portion has been redacted to a separate, sealed binder)
10  Q. (By Mr. Gadd) It's my understanding that
11  you've done some direct media advertising.
12       MR. GADD: I guess we're gone off the
13  whole attorneys' eyes only thing at this point. I'm
14  done asking about your dealers.
15  Q. (By Mr. Gadd) What print advertising have you
16  done? And when I say print, I would also include
17  electronic advertising. Was my understanding at one
18  point you were running ads that would appear in
19  magazines and trade publications and things of this
20  nature?
21  A. Correct.
22  Q. When did that come to an end?
23  A. Eight months to a year ago.
24       MR. NICHAMOFF: I'm sorry, I know I'm
25  trying on you. You've been kind to me. I'm just

Page 25

1  absolutely confused. Are you saying that Texas Made
2  Trailers was advertising itself and that's --
3       THE WITNESS: No. It was to feed the
4  dealers' areas, feed themselves from those areas. The
5  ads were placed in that dealer's area.
6       MR. NICHAMOFF: For Texas Made Trailers;
7  it was Texas Made Trailers' ads for Texas Made
8  Trailers?
9       THE WITNESS: Advertising a dealer
10  location, like actually having a dealer's information
11  on the ad.
12       MR. NICHAMOFF: I apologize. Thanks for
13  letting me clarify, John.
14       MR. GADD: No problem.
15       MR. NICHAMOFF: He had me completely spun
16  around in a circle.
17  Q. (By Mr. Gadd) So would I not see
18  advertisements that have Texas Made Trailers on it?
19  A. Yeah, absolutely.
20  Q. So what do you mean when you say you run
21  these ads for your dealers?
22  A. Just to put the fact out that they're selling
23  our trailers in that area, that our trailers are being
24  offered in that particular area.
25  Q. But these are publications, for example,

Page 26

1  these are publications that are going to be advertising
2  photos of trailers, and they're going to have your name
3  on them, your company name, Texas Made, correct?
4      A. Uh-huh.
5      Q. That is still ongoing or it's not?
6      A. No.
7      Q. You don't think that's taken place since
8  when? Last year?
9      A. Maybe, close to it. I'd say 8 months to a
10 year.
11     Q. And why do you not advertise in that manner
12 anymore?
13     A. Too expensive.
14     Q. Would that also include Craigslist? You
15 don't advertise on Craigslist?
16     A. I do not.
17     Q. So you're simply dealer base at this point?
18     A. Uh-huh.
19     Q. You were here for the duration of Jim's
20 testimony, right? I don't think you stepped out one
21 time, did you?
22     A. Huh-uh.
23     Q. Something was mentioned during his testimony
24 that was of interest to me, and you have a long history
25 in this business even though you're a young guy, right?

Page 27

1      A. Uh-huh.
2      Q. I mean, you started at 16 years old. You
3  worked for Jim. You worked for Loudo. When you go to
4  start your own enterprise, why would you call it Texas
5  Made Trailers as opposed to something else?
6      A. First thing I come up with; it sound good.
7      Q. And you were aware of the advertising and the
8  use of "Texas Pride" that Jim has employed in the past,
9  correct?
10     A. Uh-huh.
11     Q. Who actually came up with the business name
12 Texas Made Trailers?
13     A. I did.
14     Q. Why is it you would pick, other than the fact
15 you like the sound of it, why would you pick something
16 that sounded so close with respect to the words, the
17 number of syllables and so forth?
18     A. In my eyes, it wasn't that similar.
19     Q. What's the difference in your eyes?
20     A. It's a different name. I just didn't see it
21 being that close, that similar.
22     Q. You're saying it's different because you used
23 the word "made" and he uses the word "pride"?
24     A. Uh-huh.
25     Q. Any other differences?

Page 28

1      A. No.
2      Q. Did you even consider any other names?
3      A. No.
4      Q. Do you know when the company -- and I'm
5  referring to Texas Made Trailers, LLC -- when it became
6  chartered or registered with the State of Texas?
7      A. December, December 2014, I believe.
8      Q. So what took place between December 2014 and
9  June of 2015 when you actually opened the doors?
10     A. January 2015 is when we opened the doors, and
11 what took place in the meantime was basically cleaning
12 out a building to get it ready.
13     Q. When did you actually begin to construct the
14 manufacturing site?
15     A. A couple of weeks prior, I believe.
16     Q. I guess I am expecting a rather sophisticated
17 facility at least in some regards. How is it you get
18 up and running to manufacture trailers in such a quick
19 period of time?
20     A. Partners.
21     Q. I mean, did you have to construct buildings?
22     A. No. The building was there.
23     Q. Is it one building that you manufacture your
24 trailers out of, or are there multiple buildings?
25     A. One building.

Page 29

1      Q. Is the sales office separate?
2      A. No, sir.
3      Q. It's all contained in one building?
4      A. One building sectioned off.
5      Q. What's the location?
6      A. Address?
7      Q. Yes, sir.
8      A. 1097 Highway 190 East.
9      Q. Are there any other addresses connected with
10 the business?
11     A. No, huh-uh.
12     Q. When was the first date of the first sale of
13 any trailer that you made for Texas Made Trailers?
14     A. That's hard to say. That would be right
15 there at the beginning. I don't know the exact date.
16     Q. Do you recall whether or not it would be from
17 the first week that you were opened for business?
18     A. I can't recall, but I would have to figure.
19     Q. Do you know if it was a local sale, or was it
20 an out-of-state sale?
21     A. I couldn't tell you.
22     Q. Do you know when the first time it would be
23 that you actually sold a trailer that would have been
24 crossing state lines?
25     A. No.

Page 30

1   Q. How many of your sales go to out-of-state
2   locations?
3   A. 10 percent, 15 percent.
4   Q. How do you actually identify your trailers?
5   A. Build specs.
6   Q. Any other distinctive markings?
7   A. The specs themselves.
8   Q. What about with respect to logos or imagery?
9   A. I identify it by my logo.
10  Q. The process used by Texas Made Trailers, how
11  is it different than the process used by Texas Pride
12  Trailers with respect to the manufacture of the
13  trailers?
14  A. Construction of a trailer, I would have to
15  figure, would be the same throughout the industry for
16  the most part. The differences is made up by what
17  they're actually built out of.
18  Q. Do you build your trailers in a different
19  manner than the way that Jim was building his trailers?
20  A. Our shop is set up differently, yes.
21  Q. And when you say set up differently, could
22  you explain that to me.
23  A. The manner in which they weld, the
24  requirements on lengths of weld, the manner in which
25  our welders are set up on trolley systems, so I would

Page 31

1   have to say a little bit more up to speed than what Jim
2   has over there.
3   Q. Do you use the same sort of steel?
4   A. Steel is steel. No, sir. But, yeah, you use
5   the same forms but in different areas, yes. They've
6   got a different spec.
7   Q. Do you believe that your trailers are
8   superior to the trailers produced by Texas Pride?
9   A. Absolutely.
10  Q. Can you tell me how so?
11  A. Better axles, better steel, better quality.
12  Q. I thought you told me it was the same steel?
13  A. The structural make of the steel.
14  Q. What does that mean?
15  A. If you're putting an I-beam up against a
16  channel, you're obviously going to say an I-beam is a
17  better built trailer.
18  Q. What do you mean by better axles?
19  A. We use a name brand of Dexter axle known to
20  be the best in the industry.
21  Q. How is that different than what Jim uses?
22  A. It's a different axle.
23  Q. What makes you think that a Dexter axle is
24  better?
25  A. The most popular axle in the industry, known

Page 32

1   to be the best by everyone that builds trailers.
2   Q. Other than the axles, what comes to mind if
3   you're trying to differentiate your product from Jim's
4   product?
5   A. Better lumber, better quality.
6   Q. What would be the difference between the
7   lumber that Jim uses and the lumber that you're using?
8   A. He's had a number 2 or a number 3 grade
9   lumber. We're using a number 1 grade.
10  Q. Anything else?
11  A. Just overall quality really.
12  Q. When you say "overall quality," what do you
13  mean?
14  A. Quality in the welds, in the fabrication, the
15  heavier structural steel used in various spots.
16  Q. Would you give me an example of that?
17  A. Where he does a 14,000-pound trailer with
18  8-inch channel iron towing, I do an 8-inch I-beam. You
19  get into dump trailers, we're doing high flow pumps,
20  pump 25 percent more gallons per minute than what he's
21  using. We use better connections on our wiring.
22  Q. Did you take any documents from Jim Bray's
23  property when you left his employment?
24  A. Nothing other than personal files.
25  Q. What personal files did you have there?

Page 33

1   A. Just notes and like my drawings and things,
2   my hand drawings.
3   Q. You did not take any dealer information?
4   A. No.
5   Q. No client contact information?
6   A. No, none to take.
7   Q. I didn't catch the last part.
8   A. There was none to take. There was no client
9   list or anything.
10  Q. You heard Jim testify there was a stack of
11  documents you left with?
12  A. That was Derek, not me.
13  Q. Do you know whether or not that took place,
14  that Derek left with a stack of documents?
15  A. I wasn't there.
16  Q. Did you ever speak to your brother about
17  this?
18  A. No.
19  Q. Did you ever speak to your brother about the
20  lawsuit in general?
21  A. No.
22  Q. How did you prepare for your deposition here
23  today?
24  A. Hours of meeting with our attorneys.
25  Q. What documents did you review?

Page 34

1  A. All of them.
2  Q. Any in particular?
3  A. Just got, you know, everything that I've got
4  laid out right over there on the table.
5  Q. What would that be?
6  A. Pleadings.
7  Q. Exciting stuff, huh?
8  A. Uh-huh.
9  Q. So do you have a cell phone that Jim Bray had
10 given you?
11 A. Yes.
12 Q. Whatever happened to that phone?
13 A. Gave it away.
14 Q. Did you pay for the phone?
15 A. No.
16 Q. Who did you give it to?
17 A. Jeremiah Watkins.
18 Q. And who might he be?
19 A. An employee.
20 Q. Why would you give a phone that belonged to
21 Jim Bray away to Jeremiah Watkins?
22 A. Oh, this was just a few weeks ago actually.
23 It has been just sitting in a closet.
24 Q. Why would you not return it to Jim Bray?
25 A. Oh, it was busted, man. The whole face of it

Page 35

1  was busted. It was no good.
2  Q. Who broke it?
3  A. It was busted while it was still on.
4  Q. When did it get busted?
5  A. I was still employed there, fell off a
6  forklift or something.
7  Q. Was the phone inoperable?
8  A. You could operate it, but you couldn't hardly
9  see it, hear it ring.
10 Q. Why didn't you ask Jim for a new phone?
11 A. I didn't have a problem with it really.
12 Q. Why didn't you give it back to Jim?
13 A. Like Jim said, you know, we didn't have much
14 communication after the fact so...
15 Q. You never thought that put it in a package
16 and mail it back to him or ask him if he wanted it
17 back?
18 A. Huh-uh.
19 Q. When did you give the phone away?
20 A. A couple of weeks ago, two or three weeks
21 ago.
22 Q. Was it operating when you gave it away?
23 A. No. It hadn't been turned on in probably
24 since I left.
25 Q. Why would you give the guy a broken phone,

Page 36

1  just out of curiosity?
2  A. He didn't have one. He had shattered his,
3  and his actually wouldn't work. I don't think I can
4  find one at the house I got laying around. I would
5  have to admit -- I would have to think that it's --
6  shit, it may even be a chance that it's not his. I'm
7  just going to say that because I've had a stack of four
8  or five iPhones up in my closet, so there's a chance
9  that it's not even his. So I can't say that for
10 certain now.
11 Q. Do you deny that Jim Bray had given you an
12 iPhone in connection with your employment?
13 A. Do I deny that?
14 Q. Yeah.
15 A. No.
16 Q. Do you have any recollection of you having
17 given Jim an iPhone back at the end of your employment?
18 A. No.
19 Q. And why not?
20 A. Didn't think about it.
21 Q. iPhones are expensive, are they not?
22 A. Uh-huh.
23 Q. Do you presently plan on giving him the phone
24 back if you still have it?
25 A. If I could find it, I don't have a problem

Page 37

1  with that.
2  Q. What about reimbursing Jim for the price of
3  the phone?
4  A. That's fine.
5  Q. You would do that?
6  A. Uh-huh.
7  Q. Did you ever contact any retail customers of
8  Jim Bray's in order to make a sale?
9  A. No.
10 Q. What about in order to attempt to make a
11 sale?
12 A. No.
13 Q. Are you aware of any customer confusion where
14 someone has called your office, for example, looking
15 for Jim Bray's business or vice versa?
16 A. No.
17 Q. You don't believe the use of the phrase
18 "Texas Made" creates any confusion with "Texas Pride"?
19 A. No.
20 Q. Is it true that you have received certain
21 shipments intended for Jim Bray?
22 A. No.
23 Q. You deny that?
24 A. Yeah.
25 Q. Do you know whether or not Jim Bray has

Page 38

1  received shipments intended for your company?
2      A.  I do know that.
3      Q.  You do?
4      A.  Uh-huh.
5      Q.  And why would that happen?
6      A.  Mix-up on FedEx, I guess, but one of the
7  employees that started working over at our place a few
8  months back actually says he remembers seeing pallets
9  of parts over there that had our name written on it.
10     Q.  What kind of parts?
11     A.  Hydraulic pumps and axles.
12     Q.  Did you pay for those?
13     A.  Say again.
14     Q.  Did you pay for those pumps or axles?
15     A.  We do.
16     Q.  Did you pay for the ones that you believed to
17  have been mistakenly delivered to Jim Bray's office?
18     A.  At the time the bill was done and I received
19  the part, yeah, yes, they're paid.
20     Q.  I mean, are you saying that you think Jim has
21  your property?
22     A.  Just at some point there was a shipment
23  intended for us that ended up in their shop is all I'm
24  saying.
25     Q.  Some confusion?

Page 39

1      A.  Uh-huh.
2      Q.  Is that a "yes"?
3      A.  Yeah.
4      Q.  Was that an expensive order?
5      A.  I imagine every order is.
6      Q.  I mean, for example, I have no point of
7  reference for hydraulic pump, so I have no idea what
8  they cost.
9      A.  Pallet of them could be ten or fifteen grand.
10     Q.  Okay, but just to be clear, your company did
11  not get stuck for a bill for ten or $15,000 and then
12  Jim got the product?
13     A.  No.  The product was always eventually
14  delivered.
15     Q.  You keep a customer contact log?
16     A.  Nothing other than QuickBooks and that would
17  just be dealers.
18     Q.  How do you keep track of incoming phone
19  calls?
20     A.  Of incoming phone calls?
21     Q.  Uh-huh.
22     A.  I have a bookkeeper/secretary.
23     Q.  She logs all the calls down?
24     A.  I don't know if she logs every call, but if
25  they're intended for me I'll get them.

Page 40

1      Q.  Does she keep a record of the purpose of the
2  phone call; for example, if someone were to call the
3  office asking to buy a trailer?
4      A.  No more than a written ticket or somebody's
5  little message on a piece of paper.
6      Q.  There's not a formal log of any kind?
7      A.  No.
8      Q.  You mean by a written ticket like one of the
9  little tear-out sections of a message book?
10     A.  I guess, uh-huh.
11     Q.  So you would have carbon copies of those?
12     A.  I guess depending on what book.  I've seen
13  them with the carbon copies; and, you know, there's a
14  lot of Post-it's flying around at the same time so...
15     Q.  And that would be Tina's responsibility?
16     A.  Correct.
17     Q.  Why do you keep track of incoming calls for
18  the purpose of sales if they're not written down in a
19  uniform manner?
20     A.  Once I get a message, I'll call them at that
21  time.
22     Q.  Do you keep a record from that point forward?
23     A.  No.
24     Q.  When was the last time you spoke to Derek
25  Davis?

Page 41

1      A.  Yesterday.
2      Q.  What did you talk about?
3      A.  Same old stuff brothers talk about, I guess.
4      Q.  You didn't discuss the case?
5      A.  Briefly.
6      Q.  What did you tell him?  What did he tell you?
7      A.  Oh, he's just upset to think that someone has
8  got him in a suit like this; but other than that, he's
9  a man of few words.
10     Q.  Older brother or younger brother?
11     A.  Younger.
12     Q.  What did you tell him?
13     A.  That I was coming in here today.  That was
14  about the extent of it.
15     Q.  Other than your attorney, did you speak with
16  anyone else in preparation for today's testimony?
17     A.  No.
18     Q.  Are you married?
19     A.  Yes.
20     Q.  To who?
21     A.  Nicole Lee Davis.
22     Q.  How long?
23     A.  Four years, four years.
24     Q.  I thought it may be longer the way you have
25  to think about it.

Page 42

1  So with respect to "Texas Made Trailers" as a
2  mark and also "Texas tough" or "tough as Texas" as a
3  potential mark, these have been used by the
4  organization only for, what, the past 18 months?
5  A. Uh-huh.
6  Q. Was that a "yes"?
7  A. Yes.
8  Q. Did you ever receive any calls into your
9  office where someone is looking for Texas Pride
10 Trailers or Jim?
11 A. Not that I would have received.
12 Q. You don't believe that's ever happened?
13 A. I can't say.
14 Q. Tell me about your counterclaim against Jim
15 Bray or Texas Pride Trailers.
16 A. What do you want to know?
17 Q. What is it you think that Jim did wrong?
18 A. There's been numerous things.
19 Q. Okay.
20 A. Just from the start, he's had maybe six to
21 seven different aspects and specs on the trailers that
22 have changed to look like ours.
23 Q. Why is it you think that Jim Bray, a guy who
24 has sold trailers for the better part of 15 years with
25 that kind of volume, why would he need to change his

Page 43

1  product to look like yours?
2  A. It's just the same to ask why would he build
3  for that long and change them to look like mine at that
4  point.
5  Q. Do you have any thoughts on that?
6  A. It's a better-looking trailer.
7  Q. What is it you think that Jim changed?
8  A. Oh, I know that he changed the length of the
9  frame on his dump trailers to subtract a gap out in
10 between the bed and gooseneck, added a custom box that
11 we all do.
12 Q. And what would be wrong about that in your
13 opinion?
14 A. The fact that we're here with a claim that
15 we're imitating, I think that's what's wrong in
16 general.
17 Q. Anything else?
18 A. Put a diamond plate on the dovetails of all
19 of his lowboys.
20 Q. And what do you believe to be wrong about
21 that?
22 A. It's an exact copy of what we do.
23 Q. It's my understanding a lot of people who
24 make trailers in the industry use diamond plate in
25 connection with construction of the trailers. Is that

Page 44

1  incorrect?
2  A. No.
3  Q. Do you think you were the first to do it?
4  A. No.
5  Q. But that bothers you that Jim has done it?
6  A. Not really.
7  Q. It does or it does not?
8  A. Not really, no.
9  Q. The reason I'm asking you is because I asked
10 you what it was you thought Jim had done wrong.
11 A. Uh-huh.
12 Q. That was one of the things you mentioned.
13 A. That's what I think he's done wrong, but it
14 don't quite bother me.
15 Q. What else is it you think he did wrong?
16 A. That's it.
17 Q. I'm sorry?
18 A. That's it.
19 Q. If you answered, I didn't catch it.
20 A. I said that's it.
21 Q. I would like to show you this what I've got
22 marked as Exhibit 3. That should be a copy of the
23 answer and counter-claim that your attorney filed on
24 your behalf; but by all means, please read it to your
25 own satisfaction.

Page 45

1  MR. NICHAMOFF: Can we take just a quick
2  break while he's --
3  MR. GADD: Sure.
4  (Break taken)
5  Q. I'm not exactly sure where we left off, but I
6  think it was what I had marked as Exhibit Number 3, and
7  I asked if you take a look at it recently, then great;
8  if you're not, please take a second and go over it
9  until you're satisfied.
10 A. Okay.
11 MR. NICHAMOFF: Well, take your time to go
12 through it. You don't just have to agree to it. You
13 don't have to know what it means either.
14 MR. GADD: Let me go off the record for a
15 second.
16 (Off-the-record discussion was had)
17 Q. (By Mr. Gadd) If you don't mind, I need that
18 back from you. There's a few things I want to ask you
19 about.
20 Oh, before I get to that, what lines of
21 trailers do you currently make?
22 A. Utility trailers, car haulers, lowboys, dump
23 trailers, roll-off trailers, flat beds.
24 Q. Are there any other lines you intend
25 incorporating or expanding into?

Devin Davis
Texas Pride Trailers, Inc. v. Texas Made Trailers, LLC, Devin Dewayne Davis and Derek Davis

Page 46

1  A. Not at this time.
2  Q. What I would like to direct your attention to
3  is a couple of the affirmative defenses. I understand
4  you're not a lawyer. I'm not trying to bind you into
5  any kind of a legal opinion. What I would like to find
6  out is what factual information you may have in support
7  of those defenses. So if you have certain facts that
8  come to mind or facts upon which you rely in support of
9  that defense, that's what I would like to find out.
10 Does that make sense to you?
11 A. Uh-huh.
12 Q. All right. Let me ask you about affirmative
13 Defense No. 3, third one right here.
14 A. I don't understand it.
15 Q. Look at No. 3.
16      MR. NICHAMOFF: No, I understand it. He
17 doesn't understand the legal words.
18      MR. GADD: I got that.
19 Q. (By Mr. Gadd) So let me ask you ask it to you
20 this way. Are there any facts upon which you're
21 relying to assert that Jim has waived his right to use
22 the marks that he uses, such as "Texas Pride Trailers"?
23 A. He waives the rights?
24 Q. Yeah. Do you have any facts in support of
25 that, affirmative defense No. 3?

Page 47

1  A. Huh-uh.
2  Q. That was a "no"?
3  A. Right.
4       MR. NICHAMOFF: Are you asking -- well,
5  continue.
6       MR. GADD: Yeah, it's the factual basis
7  for any affirmative defenses.
8       MR. NICHAMOFF: No. I understand. Your
9  question as asked.
10 Q. (By Mr. Gadd) Let me also ask you about the
11 eighth affirmative defense, which is the concept of
12 mitigation. You can read it first.
13 A. Okay.
14 Q. Okay. Do you have any facts upon which you
15 rely to claim that Jim Bray has failed to mitigate his
16 damages?
17 A. Failed to mitigate his damages? Reword it
18 for me.
19      MR. GADD: What would be a fair way for us
20 to explain mitigation?
21      MR. NICHAMOFF: Mitigation is to take all
22 reasonable steps an ordinary reasonable person would
23 take in the exercise of reasonable diligence in order
24 to minimize the losses that they have sustained.
25 Q. (By Mr. Gadd) I tell you what, I've got a

Page 48

1  great example for you. Let's say that your car is
2  burning down in the parking lot when we walk outside
3  here today, and let's say that I can buy a fire
4  extinguisher. And you turn to me, you say, just let it
5  go, man, I owe more on it than what it's possibly
6  worth, just let it go. Well, if an insurance company
7  were to get wind of that in conversation and they were
8  to learn that you had the ability to minimize that
9  damage and you choose not to, they're going to say,
10 well, we may owe you something for the fire, the
11 initial damage, but we shouldn't have to pay you for
12 the whole damn car because you failed to mitigate.
13 Does that make sense?
14 A. Okay.
15 Q. So my question to you --
16      MR. GADD: Is that a fair --
17      MR. NICHAMOFF: That's perfect, except for
18 the fact that, you know, would it harm himself? Would
19 a reasonable person have jumped in a fire?
20      MR. GADD: He's speaking more and more as
21 a plaintiff's attorney. You've got to watch this guy.
22 Q. (By Mr. Gadd) What is it, if anything, that
23 you claimed that Jim Bray should have done but didn't
24 do to minimize any damage that would have been caused
25 by his actions in this case?

Page 49

1  A. Pulled the "Texas Made, Texas Tough" out of
2  his ads.
3  Q. That's it?
4  A. Or "Tough as Texas." My brother has actually
5  come to me not too long ago, was explaining he was
6  dealing with a retail customer at Husky and said that
7  Jim -- Jim was actually impersonating being us on his
8  end and trying to give a customer a discount on a
9  trailer, get him to drop his order at our place. You
10 know, I'd say just about -- it hasn't really been much
11 of anything he's done to help the situation in my
12 opinion.
13 Q. Now, when would that have been, this
14 situation you're referring to where you claim that Jim
15 impersonated you?
16 A. Two or three months ago.
17 Q. And who were the people involved? I know you
18 gave me one name.
19 A. My brother and the guy's name -- my brother
20 is the only one I can tell you right now. He actually
21 dealt with the customer.
22 Q. When you say he dealt with the customer?
23 A. Uh-huh.
24 Q. Maybe I misunderstood. Is he working for
25 you, or is he not working for you?

Page 50

1    A.  No, he don't work for me. He works under
2  Husky. He's an actual employee for Husky.
3    Q.  So when this was brought to your attention by
4  the way of Dewayne is it, right?
5    A.  Huh?
6    Q.  Dewayne?
7    A.  Derek.
8    Q.  Yeah, Derek. When it was brought to your
9  attention, did he have the name of this individual
10 handy?
11   A.  Yes, he did.
12   Q.  Are you willing to provide that to your
13 attorney?
14   A.  Absolutely.
15       MR. GADD: If he's able to do so, I'd like
16 to know who it is he's referring to.
17       MR. NICHAMOFF: I think there's been some
18 confusion. Maybe I can expand. Derek works for Husky.
19       MR. GADD: Correct.
20   Q.  (By Mr. Gadd) I thought there had been a time
21 where he also worked with you?
22   A.  Huh-uh.
23   Q.  But no.
24       MR. GADD: But when he said he was taking
25 care of a customer, I'm thinking wait a second, how

Page 51

1  does this work out?
2       THE WITNESS: I made a phone call, yeah.
3       MR. NICHAMOFF: So I don't know if I can
4  get documents from Husky if that makes sense.
5       MR. GADD: Well, I guess it might be -- I
6  don't think you could, but it might be beneficial to
7  the extent if you claim with this that Jim, he did
8  something to you, as he's claimed that you have done to
9  him, if, in fact, you have evidence that would support
10 what you're saying, it would probably be to everyone's
11 benefit in the end.
12      MR. NICHAMOFF: Understood.
13      MR. GADD: You may not be able to make
14 your brother do it, but it seems like to me it would
15 help your cause as opposed to hurt it.
16      MR. NICHAMOFF: To the extent we can get
17 that document from Husky, we will, but I can't commit
18 to getting Husky documents.
19      MR. GADD: I understand completely.
20   Q.  (By Mr. Gadd) Are you claiming you lost any
21 number of sales because of an advertisement that Jim
22 ran?
23   A.  I would definitely say so.
24   Q.  What do you base that on?
25   A.  The key words in a lot of his ads, you know,

Page 52

1  using the "Texas Made" and the "Tough as Texas" and you
2  can only think that that would detour a number of
3  customers.
4    Q.  Well, do you dispute that Jim has used "Tough
5  as Texas" in prior ads, and I mean going back through
6  the whole 15 years he's been in business as Texas Pride
7  Trailers?
8    A.  I don't think he's ever used "Tough as Texas"
9  or "Texas Made" in any of his ads before we started.
10 I'm pretty certain of it.
11   Q.  What do you base that opinion on?
12   A.  Being with him, knowing his ads.
13   Q.  I mean, have you had an opportunity to review
14 all the ads that Jim has placed over the past 10-15
15 years?
16   A.  Oh, yeah.
17   Q.  You have?
18   A.  A lot of them.
19   Q.  But not all of them?
20   A.  Not all of them.
21   Q.  So can you identify with specificity for me
22 any sales that you believe you lost on account of an ad
23 ran by Jim that would have used "Tough as Texas" or
24 "Texas Tough"?
25   A.  None specifically, none specifically.

Page 53

1    Q.  What about generally?
2    A.  Generally, I would say that just with, in
3  using our name, but I wouldn't say that it would be
4  costing my dealers sales more so than me, but it's -- I
5  don't -- just in general, I would say we have
6  definitely lost. We lost sales with him using our
7  slogans and logos and things.
8    Q.  I guess what I'd like to do is just separate
9  out any sort of conclusions or feelings you may have
10 from any sort of actual, well, I guess hard evidence is
11 the phrase that comes to mind or empirical data might
12 be a better way to phrase it.
13      So are there any sales that you can point to
14 that you didn't make this sale or that sale because of
15 an ad ran by Jim?
16   A.  No, because then again he's targeting a lot
17 of retail deals as to where, you know, I'm not -- I'm
18 not personally going to see that loss if I'm dealing
19 with the wholesale dealer.
20   Q.  Has any dealer or retail customer ever
21 contacted you and indicated that they would have bought
22 from you but did not buy from you on account of an
23 advertisement by Jim?
24   A.  Say that one more time.
25   Q.  Has there been any retail customer or dealer

14 (Pages 50 to 53)

Page 54

1  who has ever contacted you and he's indicated they
2  would have bought from you but they did not buy from
3  you on account of an advertisement placed by Jim?
4     A.  No.
5     Q.  Let me ask if you recognize this? I think we
6  have it marked as No. 4, Plaintiff's.
7     A.  I've never seen that.
8     Q.  Do you have any idea what it is? Are you
9  familiar with that Web site?
10    A.  I mean, that looks like the heading of our
11 site.
12    Q.  That's why I thought you may recognize it.
13    A.  I've never seen that comment though. It's
14 never been brought to my attention.
15    Q.  If you've not seen that comment, let me ask
16 it to you this way. With the header on that page, the
17 top of it, does that indicate to you that that was a
18 comment left on the comment section of your Web site?
19    A.  Generally, any comments I see like this are
20 set a different -- a different format. That's sent to
21 an actual e-mail. I've never seen it. That's hard to
22 say, man.
23    Q.  Do you have any way of knowing whether or not
24 that was a document generated by any Web site or
25 intake, Web based intake forms that would be connected

Page 55

1  to your company?
2     A.  I mean, it just looks like our header and our
3  font here; but, I mean, other than that...
4     Q.  For example, if I were to leave a comment on
5  your page, good, bad or otherwise, would it appear in
6  that format?
7     A.  No.
8     Q.  It would not?
9     A.  Not in how I receive it. They're sent to me
10 by e-mail if somebody, I'm guessing like it would have
11 to be in this section here and it comes through almost
12 in a --
13    Q.  Do you have a comment section on your Web
14 site?
15    A.  Uh-huh. I haven't been on the Web site all
16 that much after it was launched.
17    Q.  Because it looks to me as though that might
18 be something printed off of a page from your Web site,
19 but I really don't know, so that's why I'm asking you.
20    A.  I've just never seen it in that format. I
21 don't know or that comment.
22        MR. GADD: If it's all right with you,
23 Seth, I'm going to seek to attach this, but I'm going
24 to readily admit he didn't authenticate it, so that is
25 what it is. But just for the purposes, sort of

Page 56

1  integrity of the deposition so we'd know, the Court
2  would know what it is we're referring to, it's this
3  Document No. 4.
4     Q.  (By Mr. Gadd)  I'm going to also ask you
5  about this one that I've got labeled No. 5.
6     A.  Okay.
7     Q.  Do you recognize that, sir?
8     A.  Yes, sir.
9     Q.  Correct?
10    A.  Uh-huh.
11    Q.  Have you seen it before?
12    A.  Uh-huh.
13    Q.  Let me it ask it to you this way. Did you
14 see it on or about the day it was sent to that e-mail
15 address?
16    A.  No, sir.
17    Q.  When do you think you would have first seen
18 that document?
19    A.  Man, it was just here not too long ago, just
20 recently, but I don't remember ever seeing it, no, not
21 that far back.
22    Q.  Okay, fair enough. In response to that, did
23 your company take any action?
24    A.  No.
25        MR. GADD: I don't have any further

Page 57

1  questions.
2         MR. NICHAMOFF: Just a few follow-up if
3  you don't mind.
4         MR. GADD: Take your time.
5         MR. NICHAMOFF: You have no further
6  questions for this witness and you want to go to the
7  next topic?
8         MR. GADD: No. I think I've got what I
9  need. I hate for this fellow to feel left out, but I
10 think this man answered most of my questions.
11            EXAMINATION
12 BY MR. NICHAMOFF:
13    Q.  Mr. Davis, just a few follow-up questions
14 regarding, if I could refer you back to Plaintiff's
15 Exhibit 3, and I'm going to refer you to the --
16        Mr. Davis, you're aware that Texas Pride
17 Trailers is using the trademark or advertising of
18 "Texas Made, Texas Tough"?
19    A.  Uh-huh.
20    Q.  Okay. Do you have a problem with that?
21    A.  Absolutely.
22    Q.  What's your problem with it?
23    A.  The fact that it's detouring, it's
24 impersonating us, doing exactly what he's --
25    Q.  I'm going to refer you to Deposition Exhibit

### Page 58

1  Numbers 3 and 4.
2      A.  Uh-huh.
3      Q.  How does Texas Pride Trailers's use of the
4  words "Texas Made, Texas Tough" confuse, or what is
5  your concern about that?
6      A.  A lot of it being wrapped around key words
7  and things, you know, and everybody knows, I mean, 95
8  percent of anything is looked up on the Internet now,
9  and "Texas Made" and as far as Google and things now
10 you're seeing "Texas Pride" coming up at the top of the
11 list.  So to be able to use our name or slogan to
12 capture any business that's intended to look our
13 products up, I have to say that's a major problem.
14     Q.  So just to conclude, you're complaining in
15 this action on account of Texas Pride's Trailers's use
16 of the words or trademark "Texas Made, Texas Tough,"
17 correct?
18     A.  Correct.
19     Q.  And regarding the painting of the trailers,
20 how is that in any way similar or dissimilar, if at
21 all, from how the painting was done or is done by Texas
22 Pride Trailers?
23     A.  The only way it would be similar is that
24 there's a layer of prime put on in the beginning and a
25 layer of top coat at the end of the job.  Other than

### Page 59

1  that, the differences would definitely be product, how
2  we apply it and how we prep our steel before painting
3  it.
4      Q.  And who is the vendor who provides your
5  paint?
6      A.  Sherwin-Williams.
7      Q.  I show you Plaintiff's 1.
8      A.  Uh-huh.
9      Q.  Well, step back a second.  How long have
10 y'all been using Sherwin-Williams paint?
11     A.  Oh, it's been probably close to a year or so.
12     Q.  And what about before that, whose paint did
13 you use?
14     A.  Diamond Vogel.
15     Q.  Okay.  And I'm going to show you -- and how
16 long did you use Diamond Vogel's paint?
17     A.  Five, six months.
18     Q.  And what's the method of application utilized
19 by Texas Made Trailers to apply the paint?
20     A.  A lot of the differences comes in the
21 preparing itself, but we make sure to put a lot heavier
22 base coat of primer down, and then we actually apply
23 two top coats rather than just doing a dust of primer
24 with a single top coat.
25     Q.  Are you aware of a special formula of paint

### Page 60

1  utilized by Texas Pride Trailers?
2      A.  No, sir.
3      Q.  Are you aware -- well, did Texas Made
4  Trailers ever use the same formula for paint that Texas
5  Pride Trailers used?
6      A.  Not that I was aware of.  I thought I was
7  just buying black paint.
8      Q.  Referencing Plaintiff's Exhibit No. 1,
9  there's an image -- well, first off, what's Plaintiff's
10 Exhibit Number 1?
11     A.  This is the rough draft to what was going to
12 be our first dealer brochure.
13     Q.  Why did you put a picture of Texas Pride
14 Trailers' trailer there?
15     A.  At this time, this was over a month before we
16 actually even had any trailers built to take pictures
17 of, and it was kind of just getting a layout as to what
18 I was going to do once we had our product pictures.
19     Q.  Okay; and it says revision 12/1/2014.  What
20 does that mean?
21     A.  Revised 12/1/14.
22     Q.  Right?
23     A.  That was the date that it was created on.
24     Q.  When, if ever, was that page or wholesale
25 price list revised again?

### Page 61

1      A.  I would probably say three to four weeks
2  after this.
3      Q.  When, if ever, did Texas Made Trailers stop
4  using a picture of Texas Pride Trailers in its
5  wholesale price/retail price list?
6      A.  The very next book.
7      Q.  And what was the date of that publishing?
8      A.  I don't know to be exact, but I would have to
9  say it was right around three to four weeks after this.
10     Q.  And how many people received a copy of Texas
11 Made Trailers, LLC's wholesale/retail price list
12 containing a picture of Texas Pride's picture on it?
13     A.  I'm almost certain that it was only one.
14     Q.  And why did you leave a copy of that with
15 that one?
16     A.  I was showing pricing and as I had it in my
17 hand walking out, he asked if I could leave it.
18     Q.  And how many trailers, if any, have you sold
19 to this dealer --
20     A.  Zero.
21     Q.  -- with this wholesale/retail price list?
22     A.  Absolutely not.
23     Q.  So the gentleman who received Plaintiff's
24 Exhibit Number 1 never purchased one trailer from
25 y'all?

Devin Davis
Texas Pride Trailers, Inc. v. Texas Made Trailers, LLC, Devin Dewayne Davis and Derek Davis

Page 62

1  A. Correct.
2  Q. What, if any, sales were made to anyone on
3  account of a -- on account of or against a
4  wholesale/retail price list provided by you containing
5  a picture of a trailer manufactured by Texas Pride
6  Trailers?
7  A. I would have to say none.
8  Q. What, if any, retail sales are you aware of
9  that have been lost on account -- strike that. I'll
10 start over.
11        What, if any, retail sales were taken by
12 Texas Made Trailers, LLC from Texas Pride Trailers,
13 LLC?
14 A. We wouldn't have been selling direct to an
15 end user. So, I mean, he couldn't really say that I
16 was stealing his retail sales. I only have a license
17 to sell to dealers, and I sell to dealers.
18        MR. NICHAMOFF: Okay. Pass the witness.
19              FURTHER EXAMINATION
20 BY MR. GADD:
21 Q. Let me ask you one more time to make sure I'm
22 perfectly clear. You're not doing any more media type
23 advertising. Everything is run through your dealers,
24 right?
25 A. Correct. We've got a Facebook.

Page 63

1  Q. Okay. You mentioned that.
2  A. Yeah, the Facebook.
3  Q. I think earlier I had asked you about --
4  well, what do you call this? It's like an auto trader,
5  Exhibit No. 5 here, right?
6  A. Uh-huh.
7  Q. You don't do that anymore. You said it was
8  too expensive.
9  A. Right.
10 Q. And I imagine probably crazy expensive. And
11 you don't do Craigslist, right?
12 A. No, I don't.
13 Q. So the product that you're actually pushing
14 out the door and how you're making revenue and
15 hopefully profits, that's all based upon this network
16 of dealers, and I think you said there were roughly 15
17 of those guys, right?
18 A. Correct.
19 Q. So if all of your products are being
20 essentially wholesaled to dealers, right --
21 A. Uh-huh.
22 Q. -- then you're not really competing against
23 Jim for the retail customers that might see the type of
24 advertisements he's running?
25 A. No, huh-uh.

Page 64

1  Q. So that's correct?
2  A. No. That's kind of why you have dealers, so
3  they can then compete with retail.
4  Q. So you guys aren't even necessarily competing
5  for that market at this time is what you're saying?
6  A. No, no. We're just building a big dealer
7  network, I mean, that's just --
8  Q. Is that your plan to expand through a dealer
9  network?
10 A. Correct.
11 Q. And not to be retailing to some joker like me
12 that might want a trailer to drag your lawnmower around
13 on.
14 A. Absolutely. That was a lot of the reason why
15 dealers were looking for another manufacturer, you
16 know, with Jim's situation.
17 Q. Well, you said in your opinion you believe
18 you have a better product, right?
19 A. Right.
20 Q. And I guess you believe that these dealers
21 believe you have a better product?
22 A. Right.
23 Q. So would it really make any difference what
24 Jim advertised? If you already have a dealer network,
25 they like your product and you believe your product is

Page 65

1  better and if you're not competing for the retail
2  business, why would it make any difference to you what
3  Jim advertised?
4  A. It would be in the same aspect as in, you
5  know, I would say in respect for my guys that I am
6  pushing to sell our trailers, you know. I just think
7  that's an unfair way of going about it, you know, it
8  really is.
9  Q. And you maintain that even though you're not
10 competing for the same retail type customers that he is
11 at this point?
12 A. Correct, the same difference in putting your
13 own money out there to bring retail customers to that
14 dealer location.
15 Q. Can you name any dealer who has ever told you
16 that he was either confused or -- that he was ever
17 confused between you and Jim Bray based upon Jim's
18 advertising?
19 A. Have I ever had a dealer say he was confused?
20 Q. Correct.
21 A. No.
22 Q. No dealer has ever called you and said, hey,
23 man, I'm confused, is this you or is this Jim or who am
24 I dealing with here?
25 A. They've usually got their name across the

17 (Pages 62 to 65)

Page 66

1  ads.
2  Q. And I think I asked you earlier, you don't,
3  as you sit here today, you don't have any dealer or
4  retail customer who you would point to as a loss, a
5  sale lost from you in favor of Jim on account of
6  anything Jim had done?
7  A. Yeah, yeah, I can think of one. When Derek
8  first left Texas Pride, he worked for a company called
9  the Trailer Store selling our trailers in another
10 dealer location, and he actually had a couple of
11 customers on two different occasions coming out of
12 Dallas having to pass by Texas Pride, swung in there
13 thinking that that's where they were going to pick
14 their trailer up instead of Huntsville and then them
15 actually offer a better price on that unit to talk him
16 out of picking up the one that we had built for the
17 customer. So I do know that's happened a couple of
18 times, you know.
19 Q. Now, do you know who these people are?
20 A. My brother would. He keeps all his invoices,
21 yeah.
22 Q. But it's your contention or your
23 understanding that these people are driving by and they
24 see Jim's location?
25 A. Uh-huh.

Page 67

1  Q. And they go in?
2  A. Uh-huh; because when you go in, I mean, if
3  you don't have a customer show up and Derek is
4  obviously calling to follow up and go, you know, how
5  come you didn't pick this trailer up.
6  Q. Well, how would that be any different from,
7  say, when we leave here and we're going back to the
8  hotel, for example, and maybe I had planned to stop at
9  McDonald's but I see that the Burger King is closer to
10 me on this side of the road and I go there instead? I
11 mean, are you attributing some sort of culpability to
12 Jim?
13 A. Not so much; but if Jim has got salesmen in
14 that office who are calling themselves our sister
15 company. And I will get that information over to you.
16 But, yeah; he actually, he actually has a guy there
17 saying that they're a sister company of us.
18 Q. What type of trailer would you have sold to
19 these people if they would have showed up to your
20 office instead of Jim's?
21 A. A trailer that they picked up was a 14 foot
22 dump trailer, I mean, that they were coming for.
23 Q. So in general terms, what does something like
24 that retail for?
25 A. Depends on the model and the options and

Page 68

1  things, but generally anywhere from six to 10 grand.
2  Q. What would the basic profit of margin be on
3  that?
4  A. For the manufacturer, 10 to 15 percent.
5  Q. So it was a $10,000 trailer and if you had a
6  10 percent markup on it, you're talking about a
7  thousand bucks?
8  A. Uh-huh.
9  MR. GADD: I don't have any further
10 questions.
11 MR. NICHAMOFF: Reserve questions until
12 trial.
13           * * * * * * * * * *

Page 69

1           CHANGES AND SIGNATURE
2  WITNESS: DEVIN DAVIS
3  DATE OF DEPO: August 16, 2016
4    Please indicate changes on this sheet of paper,
   giving the page and line number, the change and the
5  reason for the changes. Reason for changes are: (1) To
   clarify the record; (2) To conform to the facts; (3) To
6  correct transcription errors.
7  PAGE/LINE    CHANGE            REASON
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21    I, DEVIN DAVIS, have read the foregoing
22 deposition and hereby affix my signature that same is
23 true and correct, except as noted above.
24
25           _____
             DEVIN DAVIS

Page 70

```
 1
        THE STATE OF _____)
 2
        COUNTY OF _____)
 3
 4      Before me, _____, on this
 5  day personally appeared DEVIN DAVIS, known to me (or
 6  proved to me under oath of through _____)
 7  (description of identity card or other document) to be
 8  the person whose name is subscribed to the foregoing
 9  instrument and acknowledged to me that he/she executed
10  the same for the purpose and consideration therein
11  expressed.
12      Given under my hand and seal of office this ____
13  day of _____, _____.
14
                    _____
15                  NOTARY PUBLIC IN AND FOR
                    THE STATE OF _____
16
17  My Commission Expires: _____
18
19
20
21
22
23
24
25
```

Page 71

```
 1       IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
 2                HOUSTON DIVISION
 3  TEXAS PRIDE TRAILERS, INC.   )
                                 )
 4  VS.              )C.A. No. 4:16-cv-00473
                                 )
 5  TEXAS MADE TRAILERS, LLC,   )
    DEVIN DEWAYNE DAVIS AND     )
 6  DEREK DAVIS                 )
 7
              REPORTER'S CERTIFICATION
 8              ORAL DEPOSITION OF
                  DEVIN DAVIS
 9              August 16, 2016
10      I, Brenda A. Foster, Certified Shorthand
11  Reporter in and for the State of Texas, hereby certify
12  to the following:
13      That the witness, DEVIN DAVIS, was duly
14    sworn by
15  the officer and that the transcript of the deposition
16  is a true record of the testimony given by the witness;
17      I further certify that pursuant to FRCP Rule
18  30(f)(1) that the signature of the deponent;
19      X_ was requested by the deponent or a party
20  before the completion of the deposition and returned
21  within 30 days from date of receipt of the transcript.
22  If returned, the attached Changes and Signature Page
23  contains any changes and the reasons therefore;
24      ____ was not requested by the deponent or a
25  party before the completion of the deposition.
```

Page 72

```
 1       I further certify that I am neither attorney
 2  nor counsel for, related to, nor employed by any of the
 3  parties to the action in which this testimony was
 4  taken. Further, I am not a relative or employee of any
 5  attorney of record in this cause, nor am I financially
 6  or otherwise interested in the outcome of the action.
 7       Subscribed and sworn to on this the _____
 8    day of _____, 2016.
 9
10
11          BRENDA A. FOSTER, TX CSR #2470
             Expires 12/31/2016
12
13
    Gulfstream Legal Group-Court Court Reporting
14  Texas Firm #245
    1300 Texas Ave.
15  Houston, TX  77002
    (713) 354-2339
16  (713) 237-8742 fax
17
18
19
20
21
22
23
24
25
```